Jack REYNOLDS, Appellant,

v.

NATIONAL FOOTBALL LEAGUE et al., Appellees.

Charles YOUNG et al., Appellants,

v.

NATIONAL FOOTBALL LEAGUE et al., Appellees.

Marvin CRENSHAW, Appellant,

v.

NATIONAL FOOTBALL LEAGUE et al., Appellees.

Nos. 77–1753, 77–1758 and 77–1821.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1978.

Decided Sept. 27, 1978.

Edward M. Glennon of Lindquist & Vennum, Minneapolis, Minn., argued for appellees, Kermit Alexander, et al.; Nadine Strossen and Mark R. Johnson, Minneapolis, Minn., on brief.

Before GIBSON, Chief Judge, and HEANEY and BRIGHT, Circuit Judges.

GIBSON, Chief Judge.

In these cases, fifteen active and one inactive National Football League players object to the settlement of an action brought on behalf of 5,706 former and present professional football players. The class action was prosecuted to secure monetary damages and other relief for the players from the National Football League, individual teams, and other defendants for violations of the antitrust laws. The settlement approved by the District Court[1] will provide a total of $13,675,000 for distribution to members of the plaintiff class. After carefully considering the record and the briefs and oral arguments of the parties and the objecting class members, we affirm the order of the District Court approving the settlement.

The present suit is an outgrowth of this court's decision in *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). In *Mackey*, the Rozelle Rule was challenged as a violation of section 1 of the Sherman Act. The Rozelle Rule, we noted,

> essentially provides that when a player's contractual obligation to a team expires and he signs with a different club, the signing club must provide compensation to the player's former team. If the two clubs are unable to conclude mutually satisfactory arrangements, the Commissioner may award compensation in the form of one or more players and/or draft choices as he deems fair and equitable.

543 F.2d at 609, n.1.

The District Court in *Mackey* had concluded that the Rozelle Rule was a *per se* violation of the Sherman Act. A panel of this court concluded that it was not a *per se*

Gerald Tockman, St. Louis, Mo., argued and on brief, for appellants, Jack Reynolds, et al.

Paul J. Tagliabue, Covington & Burling, Washington, D. C., argued, for appellees, National Football League, et al.; Hamilton Carothers and Jeffrey H. Howard, Washington, D. C., and James B. Loken of Faegre & Benson, Minneapolis, Minn., on brief.

1. The Honorable Earl R. Larson, Senior United States District Judge, District of Minnesota.

violation of the Sherman Act, but was a violation when considered under the standard of reasonableness, as being more restrictive than reasonably necessary to meet legitimate business needs. We also noted that the matter of restrictions on player movement was a subject of mandatory collective bargaining under § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d). Had the Rozelle Rule been a result of bona fide arms-length bargaining between the National Football League Players Association (Players Association) and the league teams, it would have qualified for the labor exemption from antitrust scrutiny. Since there was evidence to support the District Court's decision that the Rozelle Rule had not been the result of arms-length bargaining, we concluded that the labor exemption did not apply.

The National Football League applied to the Supreme Court for certiorari in *Mackey.* That petition was not acted upon prior to its being withdrawn by the football league as a part of the settlement of the present action. Thus, this court's decision in *Mackey* stands as the final decision regarding the antitrust implications of the Rozelle Rule.

Following our decision in *Mackey,* the Players Association sponsored the present class action seeking damages and other relief. The Players Association is the bargaining representative for the National Football League players. They supplied financial support for this action, which was commenced by seventy-eight named players or retired players. The class was represented by Edward M. Glennon of the firm of Lindquist & Vennum of Minneapolis. Lindquist & Vennum had represented and continues to represent the Players Association.

The course of this class action litigation is set out in detail in the District Court's findings of fact and conclusions of law. Essentially, the National Football League, the Players Association, and the class action counsel proceeded to negotiate a collective bargaining agreement between the National Football League teams and the Players Association and a settlement of the class action between the National Football League and the other defendants and the plaintiff class. This approach was eminently practical in that it was obvious that the antitrust liability suggested by our decision in *Mackey* placed a potentially crippling strain on the resources of professional football. To have ignored this and the possibly devastating effect of operating without a means of compensating teams that lost premium players would have been irresponsible. It would have endangered the availability of any recovery for the players allegedly damaged by the Rozelle Rule and would have endangered the continued employment prospects of professional football players.

We do not say that the collective bargaining agreement that resulted and the class action settlement constituted a single entity. The evidence fully supports the District Court's conclusion that the collective bargaining agreement was not part of the consideration for the class action settlement, though there was not any great incentive to settle the class action absent some agreement on the procedural rules governing player movement. Thus the inquiry to be made by the District Court in reviewing the proposed settlement and by this court in reviewing the District Court's approval of that settlement is limited to the settlement itself rather than the labor agreement contained in the collective bargaining document.[2]

As we stated in *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975);

> Our review of the settlement approved by the district court in this case is guided by the principle that:
>
> > Such a determination is committed to the sound discretion of the trial judge.

2. The District Court initially attempted to confine the hearing to the fairness, reasonableness and adequacy of the class action settlement, but the court did consider the collective bargaining agreement as it relates to the proposed settlement, stating, "The court is not in a position to render a formal opinion on the antitrust immunity of the new agreement."

Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.

*Ace Heating and Plumbing Co. v. Crane Co.,* 453 F.2d 30, 34 (3rd Cir. 1971). Only upon the clear showing that the district court abused its discretion will this court intervene to set aside a judicially approved class action settlement. *In re International House of Pancakes Franchise Litigation,* 487 F.2d 303, 304 (8th Cir. 1973). *See also City of Detroit* [*v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir. 1974)]. With these precepts in mind we turn to appellant's charges of error.

*Certification under Fed.R.Civ.P. 23(b)(1)*

█ Appellants object to certification of the class under Fed.R.Civ.P. 23(b)(1) rather than under Rule 23(b)(3).[3] Certification under the former provision provides that all class members are bound by the outcome of the lawsuit, whereas certification under the latter provision would have given appellants the opportunity to opt out of the class, as provided in Rule 23(c)(2).[4]

Certification under Rule 23(b)(1) is appropriate in two situations. To proceed under Rule 23(b)(1)(A) the court must find that

individual lawsuits would create the possibility of establishing "incompatible standards of conduct" for the party opposing the class. Subdivision (B) of Rule 23(b)(1) requires the finding that individual adjudications might as a practical matter dispose of the interests of other class members or substantially impair or impede their ability to protect their interests.

Appellants argue that Rule 23(b)(1) has not been complied with because in essence the action involved only damages for an antitrust violation. *See Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1340 (9th Cir. 1976). This argument ignores the broad scope of this action. Antitrust violations involving the rules and practices governing professional players may require imposition of broadly based remedies. *See Robertson v. National Basketball Association,* 556 F.2d 682, 685 (2d Cir. 1977) and cases cited therein. In *Robertson,* professional basketball league players sought both damages and equitable relief to resolve an antitrust class action against the league and its constituent teams. The settlement which emerged illustrates the type of relief that may be necessary to resolve antitrust actions involving the rules and practices of professional sports associations. The agreement radically modified draft practices, virtually eliminated option clauses, and modified the compensation rule, eliminating it

---

**3.** Fed.R.Civ.P. 23(b) provides in relevant part:

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of the class

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**4.** Fed.R.Civ.P. 23(c) provides in relevant part:

(c) *Determination by Order Whether Class Action To Be Maintained; Notice; Judgment; Actions Conducted Partially As Class Actions.*

\* \* \* \* \* \*

(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specific date \* \* \*.

altogether after ten years. *Id.* at 686. Similar relief was sought in this action against the National Football League, although ultimately it and the Players Association entered into a collective bargaining agreement that obviated the need for this type of remedy at the time of settlement.

The need to revise or to eliminate past rules and practices of professional football, particularly the Rozelle Rule, plainly encompassed the possibility that adjudications of separate actions could set incompatible standards of conduct for the National Football League. Defendants recognized the potential risks involved in individual prosecutions and did not indicate an acceptance of the risks or attempt to waive the protection afforded by certification under Rule 23(b)(1)(A). *See Chmieleski v. City Products Corp.*, 71 F.R.D. 118 (W.D.Mo. 1976). Also, as a practical matter, separate actions might be dispositive of the interests of class members not parties to the actions or substantially impair their ability to protect their interests, as any change in league rules and practices would uniformly be applied to all players. The members of the certified class each had rights in a common organization and contract, and contemporary adjudication avoided the possibility of one class member procuring an unfair legal or practical advantage over another. *See Rodriguez v. Family Publications Service, Inc.*, 57 F.R.D. 189, 192–93 (C.D.Cal. 1972).

■ This class action would appear to qualify for certification under Fed.R.Civ.P. 23(b)(3) also, as common questions of law and fact predominate and a class action is superior to other methods for adjudication of the controversy. Nevertheless, when the choice exists between (b)(1) and (b)(3) certification, generally it is proper to proceed under (b)(1) exclusively in order to avoid inconsistent adjudication or a compromise of class interests. *Robertson v. National Basketball Association*, 556 F.2d 682, 685

(2d Cir. 1977); *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir. 1976); *Zachary v. Chase Manhattan Bank, N.A.*, 52 F.R.D. 532, 534 (S.D.N.Y. 1971); *Mungin v. Florida East Coast Railway Co.*, 318 F.Supp. 720, 730 (M.D.Fla. 1970), *aff'd mem.* 441 F.2d 728 (5th Cir.), *cert. denied*, 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175 (1971); *Berman v. Narragansett Racing Association*, 48 F.R.D. 333, 337 (D.R.I. 1969); *Van Gemert v. Boeing Co.*, 259 F.Supp. 125, 130 (S.D.N.Y. 1966); 3B Moore, Federal Practice, ¶ 23.31[3] (1977); 7A C. Wright and A. Miller, Federal Practice and Procedure, § 1772 at 7 (1972).

■ Appellants also object to certification under Rule 23(b)(1) on the basis that distinctive and disparate subclasses required subclassing and proceeding under Rule 23(b)(3). They assert that the nature and extent of damages resulting from the challenged rules varied among the certified class of all professional football players, based upon the playing history, contract variables of each member, and status as an active or retired player. As a result of these differences, appellants claim that not all of the individual members were properly represented in the determination of the collective bargaining agreement which revised the National Football League structural rules.[5] The defect in this argument lies in appellants' misconception of the settlement agreement. The settlement could not encompass the terms of the collective bargaining agreement and Judge Larson could not have set aside this labor agreement in these suits. Proper evaluation of the proposed settlement of the class action involved consideration of the collective bargaining agreement only to the extent necessary to determine whether the compromise should be approved in light of the fact that it only provided for damages and that there was an alleged conflict between class and union interests during negotiations.[6] It cannot be

**5.** This type of claim would properly be addressed in an action against the union for breach of its duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The present collective bargaining

agreement was ratified by 453 of the 478 eligible player union members voting on the matter.

**6.** Objectors perceive a conflict between a union's fair representation duty to obtain the best for the majority of the bargaining unit and the

said that Judge Larson's decision to approve the damage award as fair, reasonable and adequate, and to permit the Players Association and the League to resolve the issue of future rules and practices through collective bargaining negotiations was an abuse of discretion.

### Notice Given Class Members

■ Appellants' argument contesting the adequacy of the notice given to the class members fails because it is premised upon this same misconception regarding the scope of the settlement approval. The District Court having properly determined that this case was maintainable as a class action under Rule 23(b)(1), the only notice to the class thereafter required was one of any proposed dismissal or compromise. This notice must be given to the class as the court directs under Rule 23(e),[7] and the court's discretion is limited only by the broad "reasonableness" standards imposed by due process. *Grunin v. International House of Pancakes*, 513 F.2d 114, 120–21 (8th Cir. 1975). The manner and timing of distribution of the notices of the April 25 and July 5 hearings are not seriously challenged. We have examined the notices and find them adequate. Appellants allege that they were denied an adequate opportunity to object to the proposed settlement because the substance of the notices failed to bring to the attention of the class members that the District Court would consider and determine whether the terms of the labor agreement, as included in the proposed settlement, were fair and reasonable. Due process requires that notice of a hearing to review the compromise of a class suit be structured in terms of content in a manner that enables class members rationally to decide whether they should intervene in the settlement proceedings or otherwise make their views known, and if they choose to

become actively involved, to have sufficient opportunity to prepare their position. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); 7A C. Wright and A. Miller, Federal Practice and Procedure, § 1839 at 430 (1972). The appellants were duly advised of this proceeding and of the proposed settlement, and were afforded a full opportunity to present their objections. Due process requires no more.

■ In the instant case, the labor agreement was not before the court for approval or disapproval. Thus any failure to notify the class members of a non-existent right to challenge the provisions of the collective bargaining agreement cannot be a basis for any relief from the judgment in the circumstances of this case.

### Conflict of Interest Allegations

Appellants object to the class certification and settlement by contending that conflicts of interest existed between various groups within the class and between the interests of the class and the interests of the sponsoring Players Association. These contentions are repeated in different forms throughout the appellant-objectors' briefs. Specifically it is argued that the interests of the active players and the interests of retired players conflict in that only active players have a vital interest in future National Football League rules regulating player movement. Appellants theorize that this conflict lessens the interest of active players in monetary damages for past antitrust violations.

This court faced an analogous situation in *Sperry Rand Corp. v. Larson*, 554 F.2d 868, 873–75 (8th Cir. 1977). That case involved

---

fiduciary obligation of a class representative to fairly represent all members of a class. This matter was considered by Judge Larson and no actual conflict appears on the record. There is no evidence of overreaching or forebearance because of the theoretical conflict.

**7.** Fed.R.Civ.P. 23(e) provides in pertinent part:

(3) *Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

union officers serving as class representatives. We held that the mandamus challenge was inadequate and that the District Court had considered the correct factors. The following principles were announced in that case and apply here:

(1) [T]he antagonism which will defeat maintenance of a class action must relate to the subject matter in controversy, as when the representative's claim conflicts with the economic interests of the class; (2) disagreements as to the remedy do not necessarily defeat a class action, especially in Title VII cases where the Court has broad powers in fashioning appropriate remedies; (3) the mere existence of political divisions or factionalism within a union does not require class decertification; (4) disagreements as to the wisdom of a union member's suing the union are not a proper basis for decertification; (5) union officers are not necessarily disenabled from suing on behalf of union members when the interests asserted are solely the interests of members and employees; (6) evidence of antagonism based on membership votes should be carefully scrutinized and should be clear and convincing; and (7) while questions of motive are secondary, the Court should be cognizant of the limitations of its supervisory powers and should be sensitive to the possible existence of ulterior motives which might jeopardize the interests of the class.

554 F.2d at 874 (footnotes omitted).

■ The District Court carefully considered these principles. We affirm the

conclusion that theoretical conflicts of interest did not require subclassification, disqualification of the named parties and class counsel, or disapproval of the settlement. *See Mungin v. Florida East Coast Railway Co.*, 318 F.Supp. 720 (M.D.Fla. 1970), *aff'd mem.* 441 F.2d 728 (5th Cir.), *cert. denied*, 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175 (1971).

The primary alleged conflict pertained to remedy. It never became a force threatening class interests because under the decision of this court in *Mackey, supra,* the question of future player movement rules was a subject for collective bargaining. The collective bargaining agreement and the class action settlement were negotiated simultaneously; however, it was clear from the evidence presented to the District Court that any disharmony was resolved in favor of the class action monetary settlement. There was testimony that the settlement fund was substantially increased by reducing funds available to the union pension fund.

No evidence on which a finding of improper actions or actual conflict of interest on the part of the named plaintiffs or their counsel has been presented. All that has been shown here is that while all class members were interested in damages only some were economically interested in future player movement restrictions. Divisions of this type are insufficient to preclude class action treatment or settlement.

Appellant-objectors' primary complaint relates to Article XV [8] of the collective bar-

---

8. Under the collective bargaining agreement, the system of limitations on player movement is contained in Article XV. Under it, all player contracts expire on February 1. A player's old club has a right of first refusal if it has given a qualifying offer in writing prior to February 1, or if a different club has made a qualifying offer before April 15. The qualifying offer essentially refers only to monetary salary payments to be made for the player's services or as a bonus for reporting; it does not include non-cash compensation or outside income possibilities. The qualifying offers begin at $30,000 for a player who has not yet completed his fourth year of credited service under the League player retirement plan. The amount increases to $40,000 for a player who has not

yet completed his fifth year, and further increases of $5,000 per year are provided for subsequent years of service.

If the old club has a right of first refusal, it may within seven days from the date it receives an offer sheet, which is a proposed agreement between the player and a new club, give the player a first refusal exercise notice which will incorporate the financial terms contained in the offer sheet. If no first refusal exercise notice is given, then the offer sheet becomes a basis of contract between the player and the new club.

In order for the old club to be entitled to compensation (draft choices), the player must have been given a qualifying offer by the new club on or before April 15. In order for a club to receive compensation, the qualifying offer

gaining agreement denominated First Refusal/Compensation Rule, which replaced the discarded Rozelle Rule. The objectors, in argument, viewed the new rule as a perpetual option rule more restrictive in thwarting freedom of movement than the old Rozelle Rule. The record, however, does not support the objectors' complaint, as 168 players played out their options in two years under the present rule as contrasted with 176 players who played out their options during eleven years under the Rozelle Rule.

It appears from the objectors' brief and argument that they desire complete, unrestricted freedom of movement from club to club, offering their services to the highest bidder. This position ignores the structured nature of any professional sport based on league competition. Precise and detailed rules must of necessity govern how the sport is played, the rules of the game, and the acquisition, number, and engagement of players. While some freedom of movement after playing out a contract is in order, complete freedom of movement would result in the best franchises acquiring most of the top players. Some leveling and balancing rules appear necessary to keep the various teams on a competitive basis, without which public interest in any sport quickly fades. This, of course, is the crux of most of the past restrictive rules and those now in force. Professional sports are set up for the enjoyment of the paying customers and not solely for the benefit of the owners or the benefit of the players. Without public support any professional sport would soon become unprofitable to the owners and the participants.

Although a collective bargaining agreement more favorable to the objectors as above average players might have been obtained, that is no reason for the court to enter into the picture and pass upon the merits of any collective bargaining agreement. In other words, the issue here is not whether the optimum collective bargaining agreement has been obtained. The objectors are few in number: 15 out of 1,400 active players and one retired player out of 4,300. This certainly does not indicate any substantial dissatisfaction with the settlement agreement. No settlement agreement arrived at between antagonists can provide the best possible world to all members of a relatively large class. Pragmatically, the settlement here appears fair, reasonable and substantial.

### Covenant Not to Sue

The objector-appellants apparently also contend that the wording of a Covenant Not to Sue contained in the settlement serves to insulate the collective bargaining agreement from judicial challenge.[9] The

must be at least $50,000 for a player who has not yet completed his seventh season and increases to larger amounts with additional years of service.

The club compensation provided is future draft choices of the new club or better choices acquired by assignment from other other clubs. A club not having the appropriate future choice or choices necessary for compensation may not sign an offer sheet under the agreement. The amount of compensation is linked to the qualifying offer. It is not apparent whether the qualifying offer contained in the offer sheet of the new club or the qualifying offer made by the old club prior to February 1 is determinative. The compensation ranges from a third-round draft choice if the qualifying offer is $50,000 but less than $65,000 to first-round choices in the two next college drafts if the qualifying offer is $200,000 or more.

The agreement also provides an exception in the case of extreme personal hardship and oth-er unusual situations. The collective bargaining agreement does give the old club an option to retain the services of its players. However, it is not readily apparent from a cursory examination of Article XV what status a player who does not sign a contract in one season would have in future years.

9. The settlement agreement provided, in part:
   *Covenant Not to Sue.* Upon issuance of a final Court Order in this action certifying the Plaintiff Class as described in the preceding paragraph 3 as a Rule 23(b)(1) class and approving the settlement of this action on the terms and subject to the conditions set forth in this Agreement, the NFLPA, the Plaintiffs, and the members of Plaintiff Class each hereby covenant not to sue, nor support financially or administratively, any suit against the NFL or any club or against the Management Council with respect to any claim relating to any aspect of the NFL rules, including without limitation, the Standard Player Contract,

District Court seems to have accepted that premise and conducted hearings into the collective bargaining agreement and made findings of fact giving limited approval to the agreement. While the District Court findings on this matter seem amply supported by the evidence, it is not necessary for us to add any stamp of approval or disapproval to the collective bargaining agreement.

In the unlikely event that any class member were to bring suit against the National Football League or the other defendants for antitrust violations resulting from the Rozelle Rule, the defendants will be able to rely on the *res judicata* effect of this case. 7A C. Wright and A. Miller, Federal Practice and Procedure, § 1789 (1972). On the other hand, if a member of the present class were to sue alleging antitrust violations in the current collective bargaining agreement, our decision in *Mackey* would entitle the defendants to assert the labor exemption to liability. *Mackey v. National Football League*, 543 F.2d 606, 623 (8th Cir. 1976). Although we need not decide the question, it appears to be a near certainty that the collective bargaining agreement was the result of "bona fide arms-length negotiations." We are satisfied that the Covenant Not to Sue is superfluous insofar as the matters properly before the District Court in this class action are concerned. To the extent that other suits are purported to be precluded by it, the disputes will have to be resolved through the machinery set up in the collective bargaining agreement or available under general principles of labor or constitutional law.

*Supervision of the Collective Bargaining Agreement*

Although the collective bargaining agreement was negotiated contemporaneously with the settlement of this class action, it was not before the District Court except as a circumstance bearing on the fairness of the settlement and the advisability of injunctive relief. The District Court was not required to decide whether the collective bargaining agreement satisfied the requirements stated in *Mackey, supra,* for exemption from the antitrust laws. Nor are we required to make this inquiry although it does appear that the *Mackey* requirements were met.

Despite this, the plaintiff class has urged that the District Court erred in failing to retain jurisdiction for purposes of supervising the collective bargaining agreement. Prior to oral argument in this case, the plaintiff class filed a motion for remand of the case or a stay of the appeal proceedings. They contended that newly discovered evidence and a change in the factual circumstances made this disposition appropriate. The only "new evidence" or "change in circumstance" is that the National Football League and its member clubs have interpreted the collective bargaining agreement in a manner different from that of the Players Association. This is precisely the kind of dispute to be re-

the NFL Player Contract, the NFL Constitution and By-Laws, the college draft, the option clause, the right of first refusal or compensation, the "Rozelle Rule," the waiver system, the trading of players, tampering and the maintenance of certain reserve lists, all in the form in which they have been modified or agreed to in the Collective Bargaining Agreement or in any other form in which they may have existed at any time, or from time to time, during the 1972 season to and including the date of final Court approval of this Settlement Agreement; *provided, however,* that nothing contained in this paragraph 5 or in Section 2 of the Collective Bargaining Agreement will prevent the NFLPA or any player from asserting that any club, acting individually or in concert with other clubs, or the

Management Council has breached the terms of this Settlement Agreement, or of the Collective Bargaining Agreement, the Standard Player Contract, the NFL Player Contract or the NFL Constitution and By-Laws, and from processing such asserted breach as a non-injury grievance under the procedures set forth in Article VII of the Collective Bargaining Agreement; and *provided further* that such covenant not to sue shall not foreclose any member of the Plaintiff Class who has duly commenced an individual action, other than the actions referred to herein, in any Federal or State Court, prior to the date of the execution of this Stipulation and Settlement Agreement, from pursuing such action to its lawful conclusion through trial and appeal.

solved by arbitration and the normal channels of labor dispute resolution. Without deciding whether the plaintiff class followed the correct procedures in raising the issue, we hold that the District Court correctly refused to exercise supervisory jurisdiction over the collective bargaining agreement in this class action. The motion to remand or stay the appeal is denied.

*Conclusion*

We have considered the other arguments raised in the appellant-objectors' briefs and in the brief of the plaintiff class seeking remand of the case, and find them to be without merit. The findings of fact made by the District Court are not clearly erroneous and it applied correct principles of law. The District Court carefully guarded the rights of absent class members. *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975). There was no abuse of discretion in approving this substantial settlement and the necessarily complicated distribution formula.

We emphasize today, as we did in *Mackey, supra*, that the subject of player movement restrictions is a proper one for resolution in the collective bargaining context. When so resolved, as it appears to have been in the current collective bargaining agreement, the labor exemption to antitrust attack applies, and the merits of the bargaining agreement are not an issue for court determination. The bargaining agreement is subject to change from time to time as it expires and is up for renegotiation.

The order approving the class action settlement is affirmed.